Slip Op. 13- 153

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                            :
SONY ELECTRONICS, INC.,          :
                                            :
                    Plaintiff,       :
                                            :        Before: Richard K. Eaton, Judge
        v.                               :
                                            :        Court No. 09-00043
UNITED STATES,                     :
                                            :
                    Defendant.     :
_____ :


## <u>OPINION</u>

[In this classification case, plaintiff's motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied.]

Dated: December 23, 2013

*Jack D. Mlawski*, Galvin & Mlawski, of New York, N.Y., for plaintiff.

*Amy M. Rubin*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, D.C., for defendant. With her on the brief were *Stuart F. Delery*, Acting Assistant Attorney General; *Barbara S. Williams*, Attorney in Charge, International Trade Field Office; *Karen V. Goff*, Commercial Litigation Branch, Civil Division, United States Department of Justice. Of counsel on the brief was *Chi S. Choy*, Office of the Assistant Chief Counsel for Import Administration, United States Customs & Border Protection.


At issue is the proper classification of Sony Electronics, Inc.'s ("Sony" or "plaintiff")

Sony NSC-GC1 Net-Sharing Cam ("the merchandise" or "NSC-GC1"). Before the court are the

cross-motions for summary judgment of plaintiff and of the United States ("defendant") on

behalf of United States Customs and Border Protection ("Customs"). Pl.'s Mot. for Summ. J.

(ECF Dkt. No. 27); Def.'s Cross-Mot. for Summ. J. (ECF Dkt. No. 34). The court has

jurisdiction pursuant to 28 U.S.C. § 1581(a) (2006).

For the reasons set forth below, plaintiff's motion for summary judgment is granted, defendant's cross-motion for summary judgment is denied, and the court finds that the NSC-GC1 is properly classified as a "digital still image video camera" under Harmonized Tariff Schedule of the United States ("HTSUS") subheading 8525.80.40 because that provision encompasses digital cameras capable of recording both still and moving images.  HTSUS 8525.80.40 (2007).

## BACKGROUND

The facts described below have been taken from the parties' stipulated facts, their statements of material facts not in dispute, the court's independent examination of the merchandise, and the record.  The NSC-GC1 is an electronic device that is capable of digitally capturing and recording still images and moving images.  The merchandise is imprinted with the words "NET-SHARING CAM."  The merchandise weighs approximately five ounces, has an LCD[1] monitor display, a built-in microphone, and uses a rechargeable lithium ion battery.

The merchandise is capable of capturing still images at five different resolutions.  It also captures moving images at two resolutions and several different frames per second rates.  The NSC-GC1 has only 2MB of user accessible internal memory and is designed to incorporate a removable flash memory stick, which is sold separately, for the storage of more than small

---

[1]        LCD ("liquid crystal display") is "a screen (such as a television screen or the screen on a watch) that works by passing a small amount of electricity through a special liquid." *LCD*, MERRIAM WEBSTER'S ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/lcd (last visited Nov. 26, 2013); *see also* MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS 1218 (6th ed. 2003) (providing a more detailed explanation of how liquid crystal display technology functions).

numbers of still images or short durations of moving images.  The camera records images

digitally, saving still images in .jpg[2] format and moving images in .mp4[3] format.

　　　In May of 2007, Sony requested a ruling as to the proper classification of the

merchandise, arguing that it should be classified as a "digital still image video camera" under

HTSUS 8525.80.40, which carries a duty rate of "free."[4]  On August 31, 2007, Customs issued

Headquarters Ruling ("HQ") H012688.  There, it took the position that the NSC-GC1 should be

classified as "Television cameras, digital cameras and video camera recorders: Other" under

HTSUS 8525.80.50, which carries a duty rate of 2.1% *ad valorem*.[5]  In its ruling, Customs

---

[2]　　A .jpg or JPEG file is "[a]n ISO/ITU standard for compressing still images. Pronounced 'jay-peg,' the JPEG format is very popular due to its variable compression range. JPEGs are saved on a sliding resolution scale based on the quality desired.  For example, an image can be saved in high quality for photo printing, in medium quality for the Web and in low quality for attaching to e-mails, the latter providing the smallest file size for fastest transmission over slow connections." *Definition of: JPEG*, PC Magazine Encyclopedia, http://www.pcmag.com/encyclopedia/term/45676/jpeg (last visited Nov. 18, 2013); McGraw-Hill Dictionary of Scientific and Technical Terms 1140 (6th ed. 2003) ("Graphics file format for compressed still images, particularly photographic images found on the World Wide Web; developed by the Joint Photographic Experts Group.").

[3]　　A .mp4 or MPEG-4 file is one of "[a] family of ISO/ITU standards for compressing digital video" that "is an extremely comprehensive system for multimedia representation and distribution . . . offer[ing] a variety of compression options" and which can "identify and deal with separate audio and video objects in the frame, which allows individual elements to be compressed more efficiently." *Definition of: MPEG*, PC Magazine Encyclopedia, http://www.pcmag.com/encyclopedia/term/47295/mpeg (last visited Nov. 18, 2013).

[4]　　HTSUS 8525.80.40 (2007) covers: "Transmission apparatus for radio-broadcasting or television, whether or not incorporating reception apparatus or sound recording or reproducing apparatus; television cameras, digital cameras and video camera recorders: Television cameras, digital cameras and video camera recorders: *Digital still image video cameras.*" HTSUS 8525.80.40 (2007) (emphasis added).

[5]　　HTSUS 8525.80.50 (2007) covers: "Transmission apparatus for radio-broadcasting or television, whether or not incorporating reception apparatus or sound recording or reproducing apparatus; television cameras, digital cameras and video camera recorders:

described the merchandise as a "digital camera" and opined that "the term 'cam'" which is imprinted on the merchandise "is associated with video as opposed to still images."  HQ H012688 (Aug. 31, 2007).

Sony imported the merchandise on November 26, 2007.  On entry, Customs classified the merchandise under HTSUS 8525.80.50.  Sony timely protested and, after paying all required duties, commenced this action.

<u>**STANDARD OF REVIEW**</u>

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  USCIT R. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).

The court reviews Customs' classification decisions de novo, applying the HTSUS General Rules of Interpretation ("GRIs") and the HTSUS Additional U.S. Rules of Interpretation ("ARIs").[6]  *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir. 2011).  A Customs classification determination is entitled to deference "proportional to its 'power to persuade.'"  *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

---

*Television cameras, digital cameras and video camera recorders: Other*." HTSUS 8525.80.40 (2007) (emphasis added).

[6]      Although referred to separately here, the GRIs and ARIs are part of the HTSUS statute which "consists of '(A) the General Notes; (B) the General Rules of Interpretation; (C) the Additional U.S. Rules of Interpretation; (D) sections I to XXII, inclusive (encompassing chapters 1 to 99, and including all section and chapter notes, article provisions, and tariff and other treatment accorded thereto); and (E) the Chemical Appendix."  *Baxter Healthcare Corp. of Puerto Rico v. United States*, 182 F.3d 1333, 1337 (Fed. Cir. 1999) (citation omitted).

## <u>DISCUSSION</u>

### I.    LEGAL FRAMEWORK

Classification determinations involve a two-step process by which the court first "ascertain[s] the meaning of the specific terms in the tariff provision" and then "determine[s] whether the goods come within the description of those terms." *Kahrs Int'l, Inc. v. United States*, 713 F.3d 640, 644 (Fed. Cir. 2013) (citation omitted).  The first step is a question of law; the second is a question of fact.  *Id.*  If there is no factual dispute regarding what the merchandise is, "the resolution of the classification issue turns on the first step, determining the proper meaning and scope of the relevant tariff provisions." *Faus Group, Inc. v. United States*, 581 F.3d 1369, 1372 (Fed. Cir. 2009) (citing *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1378 (Fed. Cir. 1999), and *Bausch & Lomb, Inc.*, 148 F.3d 1363, 1365–66 (Fed. Cir. 1998)).

As with any statute, "[w]hen interpreting HTSUS provisions, [courts] must strive to give effect to every word in the statutory text." *Deckers Outdoor Corp. v. United States*, 714 F.3d 1363, 1371 (Fed. Cir. 2013) (citing *Marx v. Gen. Revenue Corp.,* 133 S.Ct. 1166, 1178 (2013), and *Corley v. United States,* 556 U.S. 303, 314 (2009)).  An interpretation of a tariff provision will be disfavored if it "render[s] other language in [the relevant subheading] superfluous." *Id.* In other words, courts should construe the provisions of the tariff code in a way that avoids rendering terms redundant, meaningless, or inoperative.

GRI 1 directs that tariff classification initially "be determined according to the terms of the headings and any relative section or chapter notes."  Unless there is evidence of a "contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings." *La Crosse Tech., Ltd. v. United States*, 723 F.3d 1353, 1358 (Fed. Cir. 2013) (quoting *Carl Zeiss*, 195 F.3d at 1379).

After the proper HTSUS heading is determined, the court must determine the appropriate

subheading. "At the subheading level, [GRI] 6 controls and gives priority to the terms of those

subheadings and any related subheading notes as well as the relevant section, chapter, and

subchapter notes" and applies GRIs 1–5 as appropriate. *Del Monte Corp. v. United States*, 730

F.3d 1352, 1352 (Fed. Cir. 2013) (citations and internal quotation marks omitted); GRI 6

("Classification of goods in the subheadings of a heading shall be determined according to the

terms of those subheadings and any related subheading notes and, *mutatis mutandis*, to the above

rules.").

Ultimately, the court has "an independent responsibility to decide the legal issue of the

proper meaning and scope of HTSUS terms." *Warner-Lambert Co. v. United States*, 407 F.3d

1207, 1209 (Fed. Cir. 2005) (citation omitted). The court "is required to decide the correctness

not only of the importer's proposed classification but of the Government's classification as

well." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 874 (Fed. Cir. 1984).

## II.   SUMMARY JUDGMENT IS APPROPRIATE

The parties do not dispute the nature or function of the NSC-GC1. They agree that it is a

camera capable of digitally capturing still images and moving images. As has been noted,

summary judgment is appropriate where, as here, there is no "factual dispute regarding the

nature, structure, and use of imported merchandise." *Kahrs*, 713 F.3d at 644 (citation omitted).

Because there is no factual dispute as to the nature of the merchandise, the inquiry here

"collapses entirely into a question of law about the meaning and scope of the relevant tariff

provisions." *Del Monte Corp.*, 730 F.3d at 1352 (citations and internal quotation marks

omitted).

The parties agree, and the court finds, that the merchandise should be classified under

Heading 8525 and six-digit subheading HTSUS 8525.80.  Heading 8525 is an *eo nomine*

provision, which "includes all forms of the named article."  *JVC Co. of Am., Div. of US JVC*

*Corp. v. United States*, 234 F.3d 1348, 1352 (Fed. Cir. 2000) (citing *Carl Zeiss*, 195 F.3d at

1379).  HTSUS subheading 8525.80 covers "Television cameras, digital cameras and video

camera recorders."  The Explanatory Note to subheading 8525.80 states that "[t]his group covers

cameras that capture images and convert them into an electronic signal."  The Explanatory Notes

to the Harmonized Commodity Description and Coding System, 4th ed., 85.25 (2007)

("Explanatory Notes").  Because classification to the six-digit subheading is clear, the court's

task is to determine the correct eight-digit subheading level, applying GRI 6.

## III.    THE CONSTRUCTION OF HTSUS SUBHEADING 8525.80.40

The parties' dispute centers around the scope of HTSUS 8525.80.40.  In particular, they

argue for different interpretations of the phrase "digital still image video cameras" in HTSUS

subheading 8525.80.40.  Customs' position is that the phrase "digital still image video cameras"

references a single function article capable only of capturing still pictures and recording them by

electronic means.  Customs further contends that the phrase "digital still image video cameras" is

a term of art for "cameras that use video technology to principally capture and reproduce still

images."  Def.'s Mem. in Opp'n to Pl.'s Mot. for Summary J. and in Supp. of Def.'s Cross-Mot.

for Summary J. 10 (ECF Dkt. No. 34) ("Def.'s Br.").  For Customs, the word "video" in the

context of the full phrase "refers to a technology used for the capture and reproduction of images

by electronic means, rather than film."  Def.'s Br. 18.  Customs' position is that cameras capable

of taking both still and moving images are not fully covered by any one subheading, and that a

principal function analysis under Note 3 to HTSUS Section XVI is required.  Section Note 3 to

Section XVI, HTSUS (2007) ("[M]achines [with multiple functions are to] . . . be classified as if consisting only of that component or as being that machine which performs the principal function.").  Thus, under this interpretation, a camera that principally records still images by electronic means is a "still image video camera" but one that primarily captures moving images is not.  Under Customs' interpretation, plaintiff's merchandise is not classifiable under HTSUS 8525.80.40 because it principally functions as a camcorder.

Defendant continues that its interpretation of HTSUS 8525.80.40 in this manner has been a consistent practice, and is therefore entitled to deference under *Mead*.  Def.'s Br. 9 (citing *Mead Corp.*, 533 U.S. at 235, *Skidmore*, 323 U.S. at 140, *Dell Prods. LP v. United States*, 642 F.3d 1055, 1060 (Fed. Cir. 2011), and *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1335 (2011) (internal quotations omitted)).

As to its preferred classification, Customs maintains that HTSUS 8525.80.50 is intended to include video camera recorders or "camcorders," meaning cameras whose principle function is to capture moving images.  Thus, Customs argues, because the principal function of the merchandise is to capture moving images, and still image recording capability is only secondary, the NSC-GC1 is properly classified as "other" under HTSUS 8525.80.50 and not as a "digital still image video camera" under HTSUS 8525.80.40.

Customs also takes the position that a Note 3 analysis should be applied, and result in classification of the NSC-GC1 under HTSUS 8525.80.50, even if the court were to find the phrase "video" to mean moving images.  It contends that not employing a principal function analysis would obliterate any real distinction between HTSUS 8525.80.40 and HTSUS 8525.80.50, rendering the latter an empty category.  Def.'s Br. 30.  Put another way, because most modern digital cameras have the ability to capture both still images and moving images,

Customs asserts that, under plaintiff's interpretation, all of those cameras would fall under

HTSUS 8525.80.40 if no principal function analysis is necessary, thus rendering HTSUS

8525.80.50 a nullity.

Customs further argues that the term video is not made superfluous by the addition of the

word digital under its interpretation.  The term video, it contends, serves to distinguish the

cameras of HTSUS 8525.80.40 from the film-based cameras of Chapter 90.  Thus, Customs

insists that inclusion of the word "video" in the subheading is necessary for the provision to

stand alone because it functions to exclude film-based cameras from the subheading.  Customs

does not believe that exclusion of film-based cameras from Chapter 85 at the chapter level is

sufficient to make this distinction.

Sony argues that the phrase "digital still image video cameras" in HTSUS 8525.80.40 is

intended to cover digital cameras that are capable of taking both still images and moving images.

Plaintiff's Mem. of Law in Supp. of Pl.'s Mot. for Summary J. 10 (ECF Dkt. No. 27-2) ("Pl.'s

Br.").  For plaintiff, under the proper construction of HTSUS 8525.80.40, the term "video"

means "moving images."  Pl.'s Mem. of Law in Opp'n to Def.'s Cross-Mot. and in Supp. of Pl.'s

Mot. for Sum. J. 1 (ECF Dkt. No. 37) ("Pl.'s Reply").  Specifically, Sony insists that Customs'

interpretation of the term "video" would make that word redundant because the word "digital"

already provides that the camera captures pictures electronically.  Since each word of subheading

8525.80.40 must be given meaning, plaintiff claims that "video" must mean something other

than electronic picture capture and that this meaning can only be "moving images."  Moreover,

SONY maintains that an interpretation of the word "video" as electronic image capture in

8525.80.40 would be inconsistent with the common use of the word "video" and of the word's

use in other subheadings of heading 8525, as well as with the structure of the statute, the chapter

and section notes, and many of Customs' prior rulings.  Finally, Sony argues that because the word "digital" signifies electronic picture capture, no further words are necessary to separate these cameras from ones that use film.  Accordingly, Sony asserts that the proper construction of the subheading covers cameras that digitally record both still and moving images.  Because 8525.80.40 fully describes the NSC-GC1, Sony continues, it is not a composite machine for which a principal function analysis under Note 3 to Section XVI is appropriate.

Both parties also argue that the Explanatory Notes support their interpretation, cite to various dictionaries, and refer to statements made by Customs' expert David J. Bancroft to support their construction of the term "video."

### A.  Customs' Determination is Not Entitled to Deference

As an initial matter, defendant's position is that it has consistently interpreted HTSUS 8525.80.40 to require a principal function analysis, and that this consistent use provides the basis for deference being shown to its interpretation in HQ H012688.  *Mead Corp.*, 533 U.S. at 235. The court finds this argument unconvincing.  Indeed the ruling's lack of persuasive power is evidenced by Customs' inconsistency in its classification of articles under the competing headings and their predecessor headings.[7]  Consistency in Customs' interpretation of a provision

---

[7]       The phrase "still image video cameras" was introduced into the HTSUS in 1996 under HTSUS 8525.40.00 (1996) ("Still image video cameras and other video camera recorders.").  Goods entered under 8525.40.00 in 1996 were subject to a 3.4% rate of duty.  The following year, the tariff schedule was revised and the word "digital" was added to the phrase in the new subheading, 8525.40.40.  The 1997 revision created a new six digit subheading 8525.40 ("Still image video cameras and other video camera recorders"), and two new subheadings. Specifically, HTSUS 8525.40.40 ("Digital still image video cameras"), dutiable at a rate of 2.2%, and 8525.40.80 ("Other"), dutiable at a rate of 2.9%, were created.  The latter subheading covered the language formerly included in 8525.40.00: "Other: Camcorders" and "Other: Other."

       The rate of duty on each heading was reduced in 1998 to 1.5% for 8525.40.40 and 2.5% for 8525.40.80.  In 1999, the rates were again reduced to .7% for 8525.40.40 and 2.1% for

"enhances the persuasive power of that interpretation." *Dell Prods.*, 642 F.3d at 1060.  But that

principle cuts both ways.  A lack of consistency indicates that Customs has not thoroughly

considered a particular classification and undermines the persuasive power of its conclusions.

The term "still image video camera" was first introduced to the tariff schedule in 1996

and the term "digital" was added the following year.  A review of Customs' ruling letters

regarding these provisions clearly demonstrates that Customs regularly classified digital cameras

capable of capturing both still and moving images under 8525.80.40 and its predecessor

subheadings in the years prior to the importation of plantiff's merchandise.

In 2002, Customs classified five digital cameras capable of taking both moving and still

images under 8525.40.40 after applying GRI 3(c) (where essential character cannot be

determined, an item is classified under the subheading last in numerical order).  NY I85601

(Sept. 10, 2002) (classifying two cameras); NY H87527 (Feb. 6, 2002) (classifying two

cameras); NY H87528 (Feb. 1, 2002).  Tellingly, this analysis did not consider classification

---

8525.40.80.   In 2000, the rate for 8525.40.40 was changed to "free."  The duty rates associated
with each tariff heading's language remained the same in all subsequent revisions through the
import of the goods at issue.
The 1997 modifications and the three-year reduction of the rates were a result of the
presidential proclamation to Implement the World Trade Organization Ministerial Declaration on
Trade in Information Technology Products and Agreement on Distilled Spirits, Procl. 7011 of
June 30, 1997, 62 Fed. Reg. 35909, 35926–927, 35941 (Presidential Documents, July 2, 1997).
In the 2002 HTSUS, six digit subheading 8525.40 was revised to read: "Still image video
cameras and other video camera recorders; digital cameras."  Finally, in the 2007 HTSUS, the
subheadings were revised again.  Six digit subheading 8525.80 ("Television cameras, digital
cameras and video camera recorders") was created.  Within that new subheading the language of
prior eight-digit subheading 8525.40.40 found its way into new eight digit subheading
8525.80.40 and that of former eight-digit subheading 8525.40.80 moved into eight digit
subheading 8525.80.50.

under 8525.40.80, the predecessor of 8525.80.50, which would have been last in numerical order

had it been considered.[8]

In its first headquarters rulings[9] on subheading 8525.40.40, Customs revoked and

modified three NY office rulings that had classified dual function digital cameras under

8525.80.50's predecessor heading, 8525.40.80.  HQ 966531 (Sept. 4, 2003) (revoking NY

I84563); HQ 966530 (Sept. 4, 2003) (modifying NY I86730); HQ 966072 (Sept. 4, 2003)

(revoking NY I84955).  There, Customs reasoned that because of the Information Technology

Agreement of 1997, subheading 8525.40.40 encompassed "those articles commonly and

commercially referred to as digital cameras."  Because these devices, capable of both capturing

still images and functioning as webcams (taking moving images), were commonly known as

digital cameras, 8525.40.80 was expressly "not considered."

In 2005, in a conclusion directly at odds with Customs' current position, it issued a ruling

letter classifying an item known as the "VuGo Digital Video Camera," a device capable of both

still and moving image capture.  NY L88863 (Nov. 18, 2005).  There, Customs performed a

principal function analysis and determined that the item's principal function was that "of *video

recording*," i.e. the capture of moving images, and classified it under 8525.40.40 *for that very

reason*.  *Id.* (emphasis added).  Among other things, this ruling undermines the notion that "still

image video camera" is a term of art indicating the capture of still images.

---

[8]       These ruling letters considered whether the essential character of the cameras was
as a television type camera under the subheadings of 8525.30 or a digital still image video
camera of 8525.40.40.  Under GRI 3(c), when an article's essential character cannot be
determined between two or more potential headings, it is classified under the one that is
numerically last.

[9]       Headquarters rulings "are statements of the official position of the Customs
Service which are likely to be of widespread interest and application."  19 C.F.R. § 177.8(b)
(2007).

Next in 2006, Customs classified digital cameras capable of taking both still and moving images (thousands of images and hours of video) under 8525.40.40.  NY R05115 (Nov. 6, 2006); NY M85537 (Aug. 25 2006) (revoked by HQ H046643); NY R04505 (Aug. 15, 2006) (revoked by HQ H046643); NY R04507 (Aug. 15, 2006) (revoked by HQ H046643); NY R04381 (July 21, 2006) (revoked by HQ H046643 (May 10, 2010)).  In these instances, the ruling letter did not include a principal function analysis.  Rather, the letters contained no analysis beyond describing the merchandise and identifying a chosen classification.  Notably, NY R05115 anticipated the 2007 reformatting of the subheadings and advised the importer that it was "anticipated" that the item, a three function digital camera, video camera, and binoculars, would be classified under HTSUS 8525.80.40 after the revisions took effect.  NY R05115.

In March of 2007, Customs classified dual or multifunction digital cameras, i.e., those that are capable of still image capture and moving image capture, under 8525.80.40, noting a principal function analysis had been performed and that Customs determined that function to be "as a still image digital camera."  NY N007185 (Mar. 6, 2007).

Later in 2007, however, Customs issued the ruling letter that applies to the merchandise at issue in this case.  In that ruling, it stated that "[t]he scope of the heading [(8525.80.40)] did not change with the amendment of the HTSUS" in 2007, which reorganized the subheadings of HTSUS 8525.80.  HQ H012688.  Nevertheless, after performing a principal function analysis, Customs determined that, because the principal function was "of a video camera," that the article was classifiable under 8525.80.50.  HQ H012688.  This was the first time since the revocation of the 2003 NY rulings that Customs issued a ruling classifying a multifunction digital camera in the "other" heading.  It is worth observing that Customs' reasoning in the opinion made use of the term "video" as describing a moving image when it found that "the term 'cam'," that is

imprinted on the merchandise, "is associated with video as opposed to still images." HQ

H012688.  On the same day, Customs issued a different HQ ruling determining that a

multifunction article which had a principal function of a "still image camera" was classifiable

under 8525.80.40.  HQ H002853 (Aug. 31, 2007).

In 2010, three years after the importation of the merchandise and during the pendency of

this action, Customs issued HQ H046643 which revoked NY M85537, NY R04505, NY

R04507, and NY R04381, and adopted the position taken in this case.  Thus, it was not until late

in the game that Customs took the position that the phrase "digital still image video camera" is a

"term of art, its meaning is not the same as the plain meaning of its component words."  HQ

H046643.

As has been seen, over the life of HTSUS 8525.80.40 and its earlier incarnations, the

Department has not consistently applied a principal function analysis.  If anything, prior to

importation at issue in this litigation, Customs could most consistently have been said to interpret

8525.80.40 as covering any article that would be identified as a "digital camera" regardless of

whether the camera could capture both still and moving images.  Consequently, Customs'

classification determination in this case was not the result of its consistent interpretation of the

tariff, is unpersuasive, and is not entitled to deference by the court.


**B.  The Word "Video" in HTSUS 8525.80.40 Means "Moving Images"**

Despite defendant's insistence that "video" in the term "still image video camera" refers

only to electronic image capture, the court finds that "moving images" is the meaning of "video"

in HTSUS 8525.80.40.  As noted, "[w]hen a tariff term is not defined in either the HTSUS or its

legislative history, the term's correct meaning is its common meaning."  *Mita Copystar Am. v.*

*United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994) (citation omitted).  "The Trade Court may

examine many resources to ascertain the common meaning or commercial understanding of a

particular tariff term."  *Deckers*, 714 F. 3d at 1371 (citations omitted).  Here, the court has

considered (1) dictionary definitions of the term; (2) the opinion of Customs' expert; (3) the

HTSUS explanatory notes; (4) the history of the phrase "still video camera"; and (5) the overall

construction of the HTSUS, in reaching its conclusion.

### 1.  *Dictionary Definitions*

"To discern the common meaning of a tariff term, [the court] may consult dictionaries."

*Kahrs*, 713 F.3d at 644 (citation omitted).  A review of several dictionaries indicates the

dominant meaning of the term "video" at the time the language at issue was enacted was

"moving images," even though the term can also refer to video capture technology.

Plaintiff points the court to definitions from four dictionaries in support of construing the

term "video" as "moving images."  Pl.'s Br. 13–15 (citing AMERICAN HERITAGE DICTIONARY OF

THE ENGLISH LANGUAGE (2012) (defining "video" as "[a] sequence of images processed

electronically into an *analog or digital* format and displayed on a screen with sufficient rapidity

as to create the illusion of motion and continuity" (emphasis added)); *Video*, MERRIAM-WEBSTER

ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/video (2012) ("1. Television;

*also*: the visual portion of television, 2. videotape: as *a*: a recording of a motion picture or

television program for playing through a television set *b*: a videotaped performance of a song

often featuring an interpretation of the lyrics through visual images, 3: a recording similar to a

videotape but stored in digital form (as on an optical disk or a computer's hard drive).");  THE

FREE ON-LINE DICTIONARY OF COMPUTING (2010) ("Moving images stored as a sequence of

static images (called 'frames') representing snapshots of the scene, taken at regularly spaced time intervals, e.g. 50 frames per second.").

Defendant agrees that a common and commercial meaning of "video" is "moving images." Def.'s Br. 20–21. Nonetheless, Customs argues that "video" also commonly denotes "a technology used for the capture and reproduction of images by electronic means" also citing the Merriam-Webster Online Dictionary. Def.'s Reply to Pl.'s Opp'n to Def.'s Cross-Mot. for Summary J. 6 ("Def.'s Reply") (citing *Video*, THE MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/video (last viewed July 14, 2012) (defining "video" as "being, relating to, or used in the transmission or reception of the television image" or "being, relating to, or involving images on a television screen or computer display."); NEW MERRIAM-WEBSTER DICTIONARY 809 (1989)). However, because even these definitions rely on the term "television," which denotes an image that is capable of movement, Customs' sources do not support its position.

Dictionaries published contemporaneously with the statutory language's enactment are highly probative, particularly in the case of a technological term whose meaning may change quickly. *See Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental cannon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, *contemporary*, common meaning." (emphasis added and citation omitted)). To that purpose, the court also referred to the 1996 edition of the American Heritage Dictionary of the English Language which defined "video" when used as an adjective as "1. Of or relating to television, especially televised images. 2. Of or relating to videotaped productions or videotape equipment and technology" and when used as a noun as "1. The visual portion of a televised broadcast. 2. Television: a star of stage, screen, and video. 3. A videocassette or videotape,

especially one containing a recording of a movie, music performance, or television program."
AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1991 (3d Ed. 1996).  Notably,
each of these definitions, through their reference to television, videotape, and movies,
contemplates "moving images."  None specifically address a particular method of image capture,
except in reference to "videotape," which is indisputably a technology for the recording and
display of moving images.

Although the dictionaries placed on the record by the parties indicate that there are two
potential meanings of the word "video," the court looks to the ordinary meaning.  "That a
definition is broad enough to encompass one sense of a word does not establish that the word is
*ordinarily* understood in that sense."  *Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S. Ct. 1997,
2003 (2012) (citing *Mallard v. United States Dist. Court for the Southern District of Iowa*, 490
U.S. 296, 301 (1989)).  Based on these dictionary entries, it is clear that by 1997 the term
"video" was ordinarily understood to mean "moving images."

## 2.   *The Government's Expert Witness*

Both parties also rely on expert reports from Customs' expert David J. Bancroft.  The
record contains three statements by Mr. Bancroft: Stipulated Exhibit 1 ("Bancroft Report");
Stipulated Exhibit 2 ("Amended Bancroft Report"); and Def.'s Exhibit 2 ("Bancroft
Declaration").  To the limited extent that these reports are appropriate evidence in support of a
motion for summary judgment, their primary value is in demonstrating the evolution of the word
"video" over time.

Both parties rely on the Bancroft Report and Amended Bancroft report extensively. [10]

However, neither of these reports are sworn as was required by United States Court of

International Trade Rule 56(e)[11] in effect at the time of the parties' cross motions.  At that time,

USCIT Rule 56(e) was identical to the former Federal Rule of Civil Procedure 56(e) and

"unsworn statement[s] submitted in support of a summary judgment motion d[id] not meet the

requirements" of that rule.  *Citizen Watch Co. of Am., Inc. v. United States*, 34 CIT __, __, 724 F.

Supp. 2d 1316, 1325 n.9 (2010) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n.17

(1970)).[12]  Accordingly, despite the parties' extensive reliance on and quotation of those reports,

the court will not consider them.

Although the Bancroft Declaration is sworn, it is not particularly helpful to the court in

establishing the meaning of the phrase "digital still image video cameras" in HTSUS 8525.80.40.

First, Mr. Bancroft opines "that the term 'still image video camera' would not refer to a camera

that is capable of taking both still and moving images," a position evidently at odds with

Customs' principal use argument.  Bancroft Decl. ¶ 12.  Next, he acknowledges that the term

video "is also commonly used to refer to the continuously varying electronic signal that is used

---

[10]     Although Customs relies on the unsworn Amended Bancroft Report, it argues that plaintiff's reliance on the Bancroft Report was impermissible because that report was also unsworn.  Thus, there is no agreement between the parties as to the use of the Bancroft Report or the Amended Bancroft Report.  Def.'s Br. 21 n.6.

[11]     USCIT Rule 56 has since been amended to parallel current Federal Rule of Civil Procedure 56 which liberalized the type of evidence that may be used to support a motion for summary judgment.

[12]     Unlike in *Citizen Watch*, where an unsworn statement was rehabilitated by a later sworn statement, the Bancroft Declaration here makes no reference to either the Bancroft Report or the Amended Bancroft Report.  *Cf. Citizen Watch*, 34 CIT at __, 724 F. Supp. 2d at 1325 n.9 ("[T]he deficiency of an unsworn expert report may be cured for consideration on summary judgment by a later affidavit or deposition reaffirming the report.")

to represent and convey moving images in consumer products such as camcorders," again seemingly parting company with Customs position that the term video means image capture by electronic means.  Bancroft Decl. ¶ 12.

Then, after stating that dual function articles are not "still image video cameras," Mr. Bancroft appears to contradict this position by asserting that "[d]igital still cameras," a term he says is equivalent to "digital still image video camera," "and camcorders optimize one function over the other, either still image or moving image. . . . Most digital still cameras and camcorders, however, do have the components . . . to provide both still image and moving image functions." Bancroft Decl. ¶ 15.  Put another way, Mr. Bancroft says in one place that a multifunction camera would not meet the definition of a "still image video camera" but in another that it would, so long as moving image capture was not the primary function of the device.  Thus, the declaration is of little use for determining the meaning of the full term "digital still image video cameras."

Mr. Bancroft's declaration does, however, indirectly support the proposition that in 1997, when the word "digital" was added to 8525.40.40, the addition was intended to distinguish the digital cameras of 8525.40.40 from the analog cameras of 8525.40.80.   In other words, Mr. Bancroft's declaration supports the notion that Congress could not have intended the words "still image video camera" to be a term of art when the word digital was added in 1997.  In particular, Mr. Bancroft bases his view of the term "still image video camera" on the use of that phrase to describe a "type of product [that] used a modified 'video camera recorder' in order to capture, store, and display still images in a form that a consumer television set would treat is if it were a broadcast video signal."  Bancroft Decl. ¶ 10.  Pointing to two examples from 1981 and 1988, Mr. Bancroft continues to explain that these types of cameras were available "[i]n the late 1980's

and into the beginning of the 1990's, before the advent of computer based technology that could

process, store, and display still images at a consumer-friendly price level."  Bancroft Decl. ¶ 10.

He continues that "[a]round 1987, digital technology started to replace analog for recording still

images" and that "[g]iven the digital aspect of the new cameras, the term 'video' [was] no longer

needed to distinguish them from still cameras using photographic film."  Bancroft Decl. ¶ 12(c),

(d).  Thus, contrary to Customs' position, the words "still image video camera" would no longer

have been used as a term of art to denote cameras that capture still images by electronic means

by the time that the term "digital" was added in 1997.  It follows, then, that the purpose of the

addition of the word "digital" was to distinguish the electronic cameras using digital technology

to capture still and moving images from electronic cameras using analog[13] technology.

    All in all, the principal value of the Bancroft Declaration is to establish that by 1997

Congress would not have added the term "digital" if it understood the phrase "still image video

camera" to be a term of art meaning a camera that uses electronic means to capture still images.

Because Congress did add the word "digital," however, it is clear that it intended the phrase "still

image video cameras" to be interpreted according to the meaning of its individual words.

Moreover, the declaration supports the court's understanding that the common meaning of the

word "video" evolved more toward "moving images" during the 1990s.

---

    [13]    "Analog implies a continuous signal in contrast with digital, which breaks
everything into numbers.  Analog video cameras scan their viewing area a line at a time and
convert the infinitely varying intensities of red, green and blue (RGB) light into analogous
electrical signals." *Definition of: analog*,  PC MAGAZINE ENCYCLOPEDIA,
http://www.pcmag.com/encyclopedia/term/37741/analog (last visited Nov. 26, 2013)

### 3.   *The Explanatory Notes*

The Explanatory Notes, "while not legally binding, are 'persuasive' and are 'generally

indicative' of the proper interpretation of [a] tariff provision."  *Lemans Corp. v. United States*,

660 F.3d 1311, 1316 (Fed. Cir. 2011) (quoting *Drygel, Inc. v. United States*, 541 F.3d 1129,

1134 (Fed. Cir. 2008)).  Both parties rely on the Explanatory Notes, and the court finds them

useful here.

The Explanatory Note for Heading 8525, reads, in part:

> This group covers cameras that capture images and convert them into an
> electronic signal that is:
> (1) transmitted as a *video* image to a location outside the camera for viewing or
>     remote recording (i.e., television cameras).
> (2) Recorded in the camera as a still image or a *motion picture* (i.e., digital
>     cameras and *video camera recorders*).

Explanatory Note 85.25 (emphasis added).

Plaintiff asserts that the phrase "that capture images and convert them into an electronic

signal" distinguishes these electronic cameras from cameras that capture still or moving images

by other means; i.e., by the use of chemical-based film.  Pl.'s Reply 7 (citing Explanatory Note

85.25(B)).  Plaintiff further maintains that the term "video camera recorders" in Section (B)(2),

correlates to the term "motion picture."  Pl.'s Br. 7 (citing Explanatory Note 85.25(B)(2)).  Thus,

for plaintiff, the Note demonstrates that the word "video" is unnecessary to distinguish the

cameras of Chapter 85 (taking electronic pictures) from those of Chapter 90 (taking film

pictures) and, further, that the word is properly construed as "moving images."

For its part, defendant argues that the Explanatory Note suggests that "digital cameras are

those that capture images and convert them into an electronic signal which is recorded as a still

image; and video camera recorders are those that capture images electronically and record them

as a motion picture."  Def.'s Br. 20.  Defendant posits that the Explanatory Notes do not refer to

a "motion picture" as a "video."  Def.'s Br. 20 n.5.  This position, however, seems to be at odds

with the position that a "video camera recorder" is a device that captures moving images.

Defendant does not explain this inconsistency.  Nevertheless, Customs insists that the

Explanatory Notes establish that the term "video" should be construed to denote an electronic

method of image capture as a means of distinguishing electronic cameras from film cameras.

The court agrees that the Explanatory Note distinguishes electronic cameras of Chapter

85 from the cameras that capture images by other means (i.e., film) of Chapter 90.  However,

Explanatory Note 85.25 also states that "[t]he cameras of this heading capture an image [using] a

light-sensitive device . . . [which] sends an electrical representation of the images to be further

processed into an analog or digital record of the images" and that "[i]n digital cameras and video

camera recorders, images are recorded onto an internal storage device or onto media."  In other

words, the Explanatory Note interprets the phrases "television cameras," "digital cameras," and

"video camera recorders" all to denote a method of electronic image capture, regardless of

whether or not the term "video" is used in the description of the item.  Moreover, the use of the

word "video" in the term "video camera recorders" but not in "digital cameras" further

demonstrates that the Explanatory Note uses the term "video" to denote moving images.

The Note, however, does more than this.  Indeed, Explanatory Note 85.25 consistently

uses the word "video" to mean a moving image.  Explanatory Note 85.25(B) uses the term twice,

each time indicating a moving image.  Thus, the use of the word "video" in 85.25(B)(1) clearly

means a moving image because of the explanatory parenthetical that indicates that items of this

type are television cameras.  The word television means the viewing of moving images.

Similarly, 85.25(B)(2)'s parallel structure between the text and its examples also indicates that

"video" means moving images.  While the term "still image" is paired with the parenthetical

example of a "digital camera," the term "motion picture" is paired with the term "video camera

recorder."  Thus, the Explanatory Note demonstrates that the term "video" is intended to denote

a moving image or motion picture, not image capture by electronic means, in HTSUS

8525.80.40.

### 4.   History of the Term "Still Video Camera"

Next, the court does not agree with defendant that the use of the term "still video camera"

years prior to the enactment of HTSUS 8525.80.40 is probative of the subheading's meaning.

Defendant asserts that the "digital cameras" commonly used today were described as "still video

cameras" when they first appeared in the late 1980s and early 1990s.  Def.'s Br. 22.  Defendant

claims that the term "still image video camera" in the HTSUS is derived from this term and

relies on technical encyclopedias for this proposition.  Def.'s Br. 22–23 (citing MCGRAW HILL

ENCYCLOPEDIA OF SCIENCE AND TECHNOLOGY 177, 179 (7th ed. 1992) ("Still video cameras use

electronic sensors instead of film, and store the image on magnetic media or optical disks. . . .

Electronic cameras that record still images are called still video cameras.").  Defendant also

points to "The Sony Blog" which referred to another Sony product, the MAVICA, as "the first

still video camera," even though the product did not record moving images.  Def.'s Br. 23 (citing

*The Sony Blog*, SONY ELECTRONICS, *Flashback Friday: Sony MAVICA Digital Camera* (1981),

http://blog.sony.com/flashback-fridaysony-mavica-digita-camera-1981 (last visited July 23,

2012) (attached as Ex. 8 to Def.'s Br.)).

Customs also refers to documents from the Harmonized System Committee of the World

Customs Organization.  Def.'s Br. 24.  Specifically, it cites to comments submitted by the

Austrian Administration, Brazilian Administration, and Japanese Administration in 1989,

purporting to show that these foreign administrations had a uniform understanding that the term

"video" referred to video technology, and to the grouping of "television cameras," "video camera recorders," and "still video cameras" under new subheading 8525.40 during the Seventh Session in 1991.  Declaration of Lisa Cariello ¶¶ 8–12 ("Cariello Decl."); *see* Exs. A–E to Cariello Decl. Defendant contends that "in the late 1990's and early 2000's, with the advent of digital cameras, the HSC documents reflect an understanding that digital still cameras were properly classified as still image video cameras."  Def.'s Br. 26 (citing Cariello Decl. ¶ 13).

As with the Bancroft Declaration, the court does not find these instances of the use of the term "still video cameras" probative as to the meaning of HTSUS 8525.80.40.  As noted above, the Bancroft Declaration itself indicates that the technologies and the commonly used terms referring to those technologies underwent a shift with the introduction of digital technology in the early 1990s.  As such, the use of the term "still video camera" in early 1990s technical manuals, a 1981 advertisement, and in certain non-United States originating World Customs Organization documents, does not demonstrate the meaning of the term "video" as used by Congress when it changed in the HTSUS 1996 and 1997.  To the contrary, this historical overview, together with contemporaneous dictionary definitions, serves to reinforce the point that the meaning of the term "video" shifted more and more toward "moving images" as digital technology became prevalent in the late 1980s and early 1990s.

Indeed, that the word "digital" was added in 1997, shows that Congress intended its addition to distinguish the cameras of 8525.40.40 ("digital still image video cameras"), which record using digital technology, from those of 8525.40.80 ("Other: Camcorders"), which use analog technology, because it was aware that the word "video" commonly indicated "moving images" at that time.  Had Congress understood the term "still image video cameras" to denote

the electronic capture of still images as Customs suggests, the addition of the word "digital"

would have served no purpose.

### 5.   *Construction of the HTSUS*

As noted, courts should construe the provisions of the tariff code in a way that avoids

rendering terms redundant, meaningless, or inoperative.  *Deckers*, 714 F. 3d at 1371.  Here, the

overall structure of the HSTUS, including the relationship between its headings and subheadings,

is highly probative.

Defendant's argument that its interpretation of "video" as electronic image capture would

not render the word "video" superfluous is unpersuasive.  *See* Def.'s Reply 3.  Under defendant's

argument, the term "video" is essential to distinguish the electronic cameras of Chapter 85 from

film cameras of Chapter 90.  Def.'s Br. 29.  However, the interplay of HTSUS Note 1(m) to

Section XVI and HTSUS Chapter Note 1(h) to Chapter 90 already makes this distinction.

Specifically, Section Note 1(m) to Section XVI excludes all "[a]rticles of Chapter 90" from

classification within the headings of Section XVI, which includes heading 8525.  Section Note

1(m) to Section XVI, HTSUS (2007).  The articles of Chapter 90 cover film-based still and

moving image cameras.  Unlike the Explanatory Notes, the HTSUS Section and Chapter Notes

are part of the statute and carry the force of law.  As is common in the HTSUS, Note 1(h) to

Chapter 90 is Note (1)m's mirror, excluding "television cameras, digital cameras and video

camera recorders (heading 8525)" from Chapter 90.  Chapter Note 1(h) to Chapter 90, HTSUS

(2007).  These mirroring provisions, then, perform the function Customs claims for the word

"video."  That is, they separate electronic cameras from cameras that take pictures using film.

Defendant's interpretation of HTSUS 8525.80.40 would, thus, make these notes without effect,

contrary to GRI 1, or make either the word "video" or "digital" redundant.  *See* GRI 1

("[C]lassification shall be determined according to the terms of the headings *and any relative section or chapter Notes*." (emphasis added)).

Defendant's position that the meaning of the individual words in HTSUS 8525.80.40 should be ignored in favor of a reading of the entire phrase "digital still image video cameras" is equally unconvincing. As explained above, the court finds little evidence that the phrase "still image video camera" was a term of art in use at the time it appeared in the tariff schedule. Indeed, there is simply nothing to indicate that in 1997, when the word "digital" was added, the entire phrase was a term of art in in any context.

Moreover, there is no dispute that the word "video" in HTSUS 8525.80.50's phrase "video camera recorders" denotes moving images. Indeed, as plaintiff correctly points out, to adopt defendant's meaning here would require the court to apply different meanings to the word "video" in the different subheadings of HTSUS 8525.80. That is, video would denote moving images in HTSUS 8525.80.50 ("video camera recorders") and electronic image capture in 8525.80.40. Pl.'s Reply 8–9 (citing *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 570 (1995)). Thus, defendant's interpretation would also run afoul of the "established cannon of construction" that "similar language contained within the same section of a statute [is to] be accorded a consistent meaning." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 501 (1998) (citation omitted).

Finally, defendant's position that interpreting "video" to mean "moving images" would make HTSUS 8525.80.50 an empty category is meritless. The inclusion of the word "digital" in the phrase "digital still image video cameras" serves to distinguish moving image video recorders using digital technology, which fall into HTSUS 8525.80.40, from video camera recorders using analog technology. Those latter, albeit somewhat archaic, devices are still

properly covered by subheading 8525.80.50.  What is more, 8525.80.50 is the basket "other"

category of subheading 8525.80 and will continue to capture those unusual items that do not fit

into 8525.80's other subheadings.  *See, e.g.*, NY N155196 (Apr. 6, 2011) (classifying a pen with

a built in audio and video recorder under 8525.80.50).

Accordingly, the structure of the HTSUS further establishes that HTSUS 8525.80.40

encompasses those digital cameras capable of capturing both still images and moving images.

### C.  NSC-GC1 is a "Digital Still Image Video Camera" Under HTSUS 8525.80.40

Because the NSC-GC1 is fully described by HTSUS 8525.80.40 and Note 3 to Section

XVI does not apply, the merchandise is properly classified under that subheading.  That is,

because both of the NSC-GC1's functions are covered by HTSUS 8525.80.40, there is no reason

to apply a test intended to help choose between two headings.

#### 1.  *HTSUS 8525.80.40 Fully Describes the Merchandise*

As noted, there is no factual dispute as to just what the NSC-GC1 is.  It is a digital

camera capable of taking both still images and moving images.  As explained above, HTSUS

8525.80.40 encompasses such products.  Accordingly, HTSUS 8525.80.40 describes the NSC-

GC1 fully for classification purposes.

#### 2.  *Note 3 to Section XVI is Inapplicable*

Because HTSUS 8525.80.40 fully describes plaintiff's merchandise, a principal function

analysis under Note 3 to Section XVI is not appropriate here.  GRI 1[14] requires the application of

relevant HTSUS chapter and section notes.  Note 3 to Section XVI states,

---

[14]     Pursuant to GRI 1, "[t]he titles of sections, chapters and sub-chapters are provided
for ease of reference only; for legal purposes, classification shall be determined according to the

> [u]nless the context otherwise requires, composite machines consisting of two or
> more machines fitted together to form a whole and other machines designed for
> the purpose of performing two or more complementary or alternative functions
> are to be classified as if consisting only of that component or as being that
> machine which performs the principal function.

Section Note 3 to Section XVI, HTSUS (2007).  Here, a single tariff provision, 8525.80.40, fully

describes the merchandise, so it is not necessary to engage in an analysis beyond GRI 1.

Although the merchandise is a machine capable of two functions, i.e., capturing moving and still

images, both of those functions are described by subheading 8525.80.40.  Note 3 is only

applicable where an item possesses multiple functions that are accounted for in different tariff

provisions.  Where a heading describes all of the functions of a multifunction article, an analysis

of the principal function under Note 3 is not necessary.  As noted, subheading 8525.80.40 covers

all of the primary functions of the merchandise.  Consequently, a principal function analysis is

not appropriate.


## CONCLUSION

For the reasons stated above, the court concludes that the correct tariff classification for

the Sony NSC-GC1 Net-Sharing Cam is subheading 8525.80.40, HTSUS, subject to a duty rate

of "free."  Judgment will enter accordingly.



                                                    /s  Richard K. Eaton
                                                    Richard K. Eaton


Dated: December 23, 2013
       New York, New York

---

terms of the headings and any relative section or chapter notes and, provided such headings or
notes do not otherwise require, according to [GRIs 2 through 6]."  GRI 1.